# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

BRITTNEY ELLIS,

     **Plaintiff,**

     v.

                        **Case No. 20-CV-37**

WHITEWATER AUTO INC., et al.,

     **Defendants.**

---

## REPORT AND RECOMMENDATION ON AWARD OF
## DAMAGES AND ATTORNEYS' FEES

---

Brittney Ellis worked for Whitewater Auto Inc. d/b/a Pron-Tow Towing ("Pron-Tow"), and Pron-Tow's owner, Jeffrey Zingg, from January 4, 2018 until May 17, 2019. Ellis sues Pron-Tow and Zingg, alleging that they failed to pay her overtime throughout her tenure at Pron-Tow and failed to pay her wages for her last two days of work, May 16 and 17, 2019, in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq*. and the Wisconsin Wage Payment and Collection Laws ("WWPCL").

A bench trial was held on July 18, 2022 before the Honorable J.P. Stadtmueller. Judge Stadtmueller found that Ellis was owed both overtime during her time at Pron-Tow and wages for her last two days of employment. Judge Stadtmueller ordered the parties to attempt to resolve the issues of damages and attorneys' fees. As the parties were unable to resolve these issues, the matters were referred to me for a report and recommendation. For the reasons further explained below, I recommend that Ellis be awarded $2,354.72 in overtime pay and $2,354.72 in liquidated damages under the FLSA; $193.50 in unpaid

wages and $96.75 in liquidate damages under the WWPCL; $60,720.00 in attorneys' fees; and $3,091.13 in costs under the FLSA.

### *Damages for FLSA and WWPCL Violations*

#### *1. Background*

Jeffrey Zingg was the sole owner and president of Whitewater Auto, Inc., a Waukesha, Wisconsin business that performs towing services under the name Pron-Tow Towing. (Parties' Stipulated Facts ("Stip. Facts") ¶¶ 2–3, 7–8, Docket # 28-1.) Ellis began working as a dispatcher for Pron-Tow on January 4, 2018. (Bench Trial Transcript ("Tr.") at 13, 31, Docket # 38.) As a dispatcher, Ellis was responsible for fielding calls and sending the tow truck drivers out to service vehicles. (Tr. 31–32.) Ellis was paid hourly throughout her tenure with Pron-Tow. (Tr. 36–37.) As a dispatcher, Ellis was paid $16/hour while working in the office and $8/hour while working remotely from home. (Tr. 32.)

Soon after beginning her employment with Pron-Tow, the company's manager, Brooke Dollak, left her position. (Tr. 33–34.) Prior to Dollak's departure, Ellis began taking on more responsibilities as Dollak "wasn't there and things needed to get done and [Ellis] was eager to learn and eager to move up." (Tr. 35.) At the end of March or early April 2018, Zingg approached Ellis about becoming Pron-Tow's new manager. (Tr. 36.) The new position came with increased responsibilities and increased pay. Beginning May 1, 2018, Ellis was paid $18/hour for work performed in the office (Tr. 122) and $9/hour while working remotely (Stip. Facts ¶ 28).

During her tenure with Pron-Tow, Ellis recorded her hours worked each workday and each workweek by "clocking in" and "clocking out" using an electronic application called "TSheets." (Stip Facts. ¶ 30.) "TSheets" contained a GPS location system which

2

allowed the defendants to monitor their employees' physical location. (*Id.* ¶ 31.) While Ellis recorded her hours worked in "TSheets," Zingg then performed payroll by inputting the total hours Ellis worked each pay period into QuickBooks to generate her bi-monthly paycheck. (*Id.* ¶ 34.) Zingg did not, however, review "TSheets" to determine whether Ellis worked more than forty hours per workweek, with a workweek being defined as "Sunday at 12:01 A.M. [through] Saturday, at 12:00 midnight." (*Id.* ¶¶ 35–36.)

Ellis testified that beginning in February or March 2018, she began working longer hours and weekends covering for Dollak or "another lady in the office" because she was "eager to be a part of the company." (Tr. 46.) She testified that she was working "at minimum 45 to 50" hours per week during this time period. (Tr. 46–47.) Ellis testified that whatever she recorded as hours worked in "TSheets" was "more or less an accurate number of hours that [she] had actually worked." (Tr. 48.)

Ellis' last day worked at Pron-Tow was May 17, 2019. (Tr. 49.) Ellis testified that subsequent to that date, she returned once to drop off keys and equipment. (*Id.*) The parties agree that Pron-Tow never paid Ellis for the 10.75 hours she worked on May 16 and May 17, 2019, amounting to $193.50 in wages. (Stip. Facts ¶ 39.) The parties further stipulate that during her tenure with Pron-Tow, Ellis was never compensated at an overtime rate of pay. (*Id.* ¶ 38.)

After hearing both Zingg and Ellis' testimony, Judge Stadtmueller ruled that Ellis was not an exempt employee under the FLSA, thus triggering Pron-Tow's obligation to pay overtime. (Tr. 142.) He further found that there was "little question" that Ellis did work in excess of 40 hours per week during certain workweeks while employed at Pron-Tow and for those weeks, she is owed overtime pay. (Tr. 140–41.)

3

As to the period between January and March 2018, Judge Stadtmueller found that neither side produced "any meaningful records that would corroborate the availability of overtime." (Tr. 140–41.) Judge Stadtmueller further found that Ellis was due overtime "for any pay period that she worked in excess of 40 hours starting in March of 2018 through the balance of her term of employment, namely May of 2019." (Tr. 144.) Judge Stadtmueller ruled that any overtime awarded should be compensated at a rate of time and a half. (Tr. 143.)

Finally, as to Ellis' last two days of employment—May 16 and 17, 2019—Judge Stadtmueller found that Ellis was entitled to the approximately $200 in wages owed for her work those two days. (Tr. 143.)

In sum, Ellis argues that the record evidence and the Court's ruling in Ellis' favor supports an award of $5,353.69 consisting of $193.50 in non-overtime wages and $96.75 in liquidated damages under the WWPCL, and $2,531.72 in overtime pay and $2,531.72 in liquidated damages under the FLSA. (Pl.'s Br. at 2–13, Docket # 39.)

    2.    The Parties' Arguments

As to Ellis' claims under the FLSA, she seeks $177.00 in overtime pay for hours worked between January and March 2018 and $2,354.72 in overtime pay for hours worked between April 2018 and May 2019, for a total of $2,531.72 in overtime pay. Ellis argues that she is owed the same amount ($2,531.72) in liquidated damages under 29 U.S.C. § 216(b), which states that employers who violated the FLSA "shall be liable to the employee or employees affected in the amount of . . . their unpaid overtime compensation . . . and in an additional equal amount as liquidated damages." (Pl.'s Br. at 11.) As to her claims under the WWPCL, Ellis seeks $193.50 in wages for work performed on May 16 and 17, 2019 and

4

liquidated damages in the amount of $96.75 under Wis. Stat. § 109.11(2)(a), which provides that "a circuit court may order the employer to pay to the employee, in addition to the amount of wages due and unpaid . . . increased wages of not more than 50 percent of the amount of wages due and unpaid." (*Id.* at 3.)

Defendants do not quibble with Ellis' calculations of overtime compensation or liquidated damages. Rather, they argue that Ellis failed to return a computer worth approximately $6,451.76 when she left Pron-Tow Towing. (Defs.' Br. at 2, Docket # 43.) Thus, defendants argue that even if Ellis' damages were accepted at $5,353.69, the cost of the computer more than off-sets Ellis' alleged damages. Defendants focus on Judge Stadtmueller's statement at trial:

> And to the extent that there may be responsibility for the unreturned property, depending, of course, on how valuable it is, that may serve as an appropriate setoff for any amount that may be due and payable for the overtime that we have been discussing.

(Defs.' Br. at 2, quoting Tr. 143.) Defendants argue that Judge Stadtmueller's statement "suggest[s] need for further hearing on damages and as to whether [sic] are any." (*Id.*)

*3. Analysis*

3.1    Overtime Pay Under the FLSA

At trial, Judge Stadtmueller determined that Ellis is indeed owed overtime pay, but only for those weeks in which she worked more than 40 hours and to the extent there is evidence to support the number of hours worked. (Tr. 140–41.) Four exhibits were admitted into evidence at trial. Plaintiff's Exhibit 1 consists of Ellis' pay statements from the end of March 2018 through May 2019. (Tr. 11, Pl.'s Ex. 1, Docket # 29-1.) From the June 16, 2018 through June 30, 2018 pay period until the end of her employment, Ellis' pay

5

statements consistently articulate the number of hours Ellis worked for that two-week period of time. (*See* Ex. 1, Docket # 29-1 at 1–21.) For the remaining pay periods covering March through early June 2018, however, the statements indicate only the *amount* Ellis was paid and fail to indicate the number of hours worked. (*Id.* at 23–29.) Plaintiff's Exhibit 2 is a demonstrative exhibit consisting of a summary of the pay stubs found in Exhibit 1. (Tr. 15, Pl.'s Ex. 2, Docket # 29-2.)

The Court also admitted Plaintiff's Exhibit 3 at trial. (Tr. 19, Pl.'s Ex. 3, Docket # 29-3.) Exhibit 3 are Ellis' hour logs that she inputted into TSheets from her phone. (Tr. 20.) The Court admitted Plaintiff's Exhibit 4, a demonstrative exhibit created by Ellis. (Tr. 43, 97, Trial Ex. 4, Docket # 29-4.) Exhibit 4 consists of a calendar running from March 2018 through May 2019. (Docket # 29-4.) Ellis testified that beginning with the April 2018 calendar on Exhibit 4, the numbers appearing on each calendar day correspond with the entries from her TSheets found in Exhibit 3. (Tr. 44.) Ellis testified that she believed the numbers shown on Plaintiff's Exhibit 4 accurately depicted her hours worked. (Tr. 45.)

I begin with Ellis' alleged overtime owed for the period of January through March 2018. For this period, Judge Stadtmueller noted that "unfortunately, neither side brought to the Court's attention any meaningful records that would corroborate the availability of overtime for the period prior to March of 2018." (Tr. 140–41.) Thus, while Ellis argues that Judge Stadtmueller determined that overtime is owed for the period between January and March 2018 (Pl.'s Br. at 7), that is inaccurate. Judge Stadtmueller specifically stated that "to recap, the Court finds in favor of Miss Ellis on overtime for any pay period that she worked in excess of 40 hours *starting in March of 2018* through the balance of her term of employment, namely May of 2019." (Tr. 144) (emphasis added).

6

That leaves overtime owed for March 2018. The record evidence of hours worked in March 2018 is unclear. Plaintiff's Exhibit 1 includes a pay stub purportedly for the pay period from "March 31, 2018 through March 31, 2018." (Docket # 29-1 at 29.) This shows Ellis was paid $4,368.29 (*id*.) corresponding to 311.4 hours of work (Pl.'s Ex. 2, Docket # 29-2). Zingg testified that Pron-Tow switched accounting software and that this amount reflected Ellis' pay from the time she began her employment to when Pron-Tow switched accounting services, though that specific date is not entirely clear. (Tr. 14.)

While an employee bears the burden of proving that she performed overtime work for which she was not properly compensated, *Brown v. Fam. Dollar Stores of IN, LP*, 534 F.3d 593, 594 (7th Cir. 2008) (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87 (1946), superseded by statute on other grounds as stated in *IBP, Inc. v. Alvarez*, 546 U.S. 21, 41 (2005)), the FLSA provides that every employer subject to the statute's provisions "shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him." 29 U.S.C. § 211(c). Thus, the Supreme Court in *Anderson* recognized that "where an employer failed to keep the proper and accurate records required by the FLSA, the employer rather than the employee should bear the consequences of that failure." *Brown*, 534 F.3d at 595 (citing *Anderson*, 328 U.S. at 687–88). The Court stated:

> In such a situation we hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

7

*Anderson*, 328 U.S. at 687–88.

Pron-Tow clearly failed to keep proper records in accordance with the FLSA as to the month of March. Ellis argues, however, that she has produced sufficient evidence to show that she is owed $177.00 in overtime pay for this period. At trial, Ellis testified that her hours worked in May 2018 appeared "fairly comparable" to the hours she was working in March 2018. (Tr. 97.) Ellis worked 29.5 hours of overtime in May 2018. (Pl.'s Ex. 4, Docket # 29-4 at 3.) Because it is unknown how many hours she physically worked at Pron-Tow (at a rate of $16/hours) as opposed to hours she worked remotely (at a rate of $8/hour), she argues that it is "reasonable" to use a "blended" rate of $12/hour and an overtime rate of $6/hour. (Pl.'s Br. at 10–11.) Thus, multiplying $6 by 29.5 hours equals $177.00.

But Ellis also testified that she reviewed Plaintiff's Exhibit 4 and believed that the total number of hours as reflected in the red numbers in the exhibit are a correct total of hours worked in that workweek. (Tr. 44–45.) Exhibit 4 *does* contain data for the weeks of March 12, March 19, and March 26, 2018, and for all three of these weeks, the "red numbers" show that she worked *less than* 40 hours for those weeks. (Pl.'s Ex. 4, Docket # 29-4 at 1.) Furthermore, every day in March 2018 where hours worked were recorded, Ellis worked 5.64 hours. (Docket # 29-4 at 1.) It seems highly unlikely that the weeks of February 26 and March 5 are any different. For these reasons, I recommend Ellis not be awarded overtime for the months of January, February, and March 2018.

Turning to the time period between April 2018 and May 2019, Ellis contends that the evidence shows she is entitled to $2,354.72 in overtime pay. (Pl.'s Br. at 6.) The evidence supporting this finding is weak, at best. Again, Exhibit 3 represents the number of hours

8

recorded in Ellis' TSheets. (Tr. 124, 134.) Ellis herself testified, however, that she believed some of the hours as recorded were inaccurate. (Tr. 41–42.) And it was these hours that were used to complete Exhibit 4, showing the number of hours worked over 40 hours each week. (Tr. 44–45.) Judge Stadtmueller specifically questioned the integrity and clarity of these two exhibits (Tr. 71–72, 143); but, he found the concerns "ameliorated by virtue of what was actually paid in wages as detailed in Exhibit 1," which was "an uncontroverted exhibit" (Tr. 143).

The problem with Exhibit 1though is that the pay stubs represent pay periods running from the first of the month until the fifteenth of the month and from the sixteenth of the month until the end of the month. (Docket # 29-1.) And while there are clearly multiple two-week pay periods in which Ellis worked over eighty hours (*see, e.g.*, 7/1/18–7/15/18; 7/16/18–7/31/18; 8/1/18–8/15/18; 8/16/18–8/31/18; 10/1/18–10/15/18; 10/16/18–10/31/18; 11/1/18–11/15/18; 11/16/18–11/30/18; 12/1/18–12/15/18; 12/16/18–12/31/18; 4/1/19–4/15/19), these pay periods do not always neatly coincide with the beginning of the workweek. Nor is it clear the breakdown of hours per week. For example, for the pay period July 1 through 15, 2018, Exhibit 1 shows Ellis worked 97.5 hours. (Docket # 29-1 at 21.) For July 16 through 31, 2018, Exhibit 1 shows that Ellis worked 109.58 hours. (Docket # 29-1 at 20.) But I cannot tell from these documents whether Ellis worked 90 hours one week and 7 hours the next, or about 50 hours each week.

To find that detail, I must turn to Exhibits 3 and 4. In Exhibit 4, Ellis claims she worked as follows:

| Work Week (Sun. to Sat.) | Hours Worked | Hours Above 40 |
|---|---|---|
| July 1 –July 7 | 47.5 | 7.5 |
| July 8 –July 14 | 50 | 10 |

9

| July 15 –July 21 | 51.5 | 11.5 |
| July 22 –July 28 | 42 | 2 |
| July 29 –August 4 | 43.5 (14 hours in July) | 3.5 |

(Docket # 29-4 at 5.) But again, both the parties and the Court questioned the accuracy of Exhibits 3 and 4. Thus, the only way to corroborate Ellis' overtime claim is through suspect documents. And July 2018 is a good example as to why it was right to question the accuracy of these documents. Adding the numbers Ellis claimed she worked in July 2018 according to Exhibit 4, amount to 205 hours. According to Exhibit 1, however, Ellis was paid for 207.08 hours in the month of July.

To resolve the damages issue, then, I am left with the burden of proof as articulated in *Anderson*. Pron-Tow had a duty under the FLSA to keep accurate records. Having failed to do so, even with the questionable accuracy of Exhibits 3 and 4, I find that Ellis has provided sufficient evidence showing the amount of overtime she is owed. The burden then shifts to Pron-Tow to come forward with evidence of the precise amount of work performed or with evidence to negate the reasonableness of the inference to be drawn from Ellis' evidence. But Pron-Tow does nothing to challenge Ellis' overtime calculation, instead relying on the argument that her damages are off-set by the allegedly unreturned laptop. For these reasons, I recommend that Ellis be awarded $2,354.72 in overtime pay for the period between April 2018 and May 2019.

### 3.2 Liquidated Damages Under the FLSA

Ellis argues that defendants owe her liquidated damages on her unpaid overtime wages in the amount of $2,531.72. (Pl.'s Br. at 11.) The FLSA provides that an employer "who violates the provisions of section 206 or section 207 of this title shall be liable to the employee . . . affected in the amount of . . . their unpaid overtime compensation . . . in an

10

additional equal amount as liquidated damages." 29 U.S.C. § 216(b). "[L]iquidated damages are presumptively appropriate for FLSA violations." *Urnikis-Negro v. Am. Fam. Prop. Servs.*, 616 F.3d 665, 672 (7th Cir. 2010). However, the statute also provides:

> [I]f the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA], the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of this title.

29 U.S.C. § 260. The employer bears the burden of proving both good faith and reasonable belief. *Uphoff v. Elegant Bath, Ltd.*, 176 F.3d 399, 405 (7th Cir. 1999).

Pron-Tow has failed to carry this burden. In fact, the parties stipulated that defendants knew if Ellis worked more than 40 hours in a work week that she was owed overtime (Stip. Facts ¶ 19, Docket # 28-1), yet defendants never paid her overtime (*id.* ¶¶ 37–38). Thus, I recommend Ellis be awarded liquidated damages, but in the amount of $2,354.72.

### 3.3     Unpaid Wages Under the WWPCL

The parties do not dispute that Ellis performed 10.75 hours of work on May 16–17, 2019 for which she was not compensated in the amount of $193.50. (Stip. Facts ¶ 39.) Judge Stadtmueller determined at trial that Ellis was owed this amount for the work performed on these two days. (Tr. 143.) Thus, I recommend Ellis be awarded $193.50 in unpaid wages under the WWPCL.

### 3.4     Liquidated Damages under the WWPCL

Ellis further argues that she should be awarded $96.75 in liquidated damages under the WWPCL. (Pl.'s Br. at 3.) Wis. Stat. Ann. § 109.11(2)(a) provides that if an employee

11

commences a wage claim in court under the WWPCL, the court may award "increased wages of not more than 50 percent of the amount of wages due and unpaid." While "this statute does not require a court to impose a penalty," it "authorizes a court to do so in the exercise of its discretion." *Lynch v. Crossroads Counseling Ctr., Inc.*, 2004 WI App 114, ¶ 31, 275 Wis. 2d 171, 190, 684 N.W.2d 141, 150. The Wisconsin Supreme Court has found that if "the wage dispute was the result of an honest misunderstanding, a mistake, or a reasonable dispute, a circuit court might very well not award civil penalties or expenses to an employee who rushes into court and bypasses the alternative dispute resolution the legislature provided through the DWD." *Hubbard v. Messer*, 2003 WI 145, ¶ 40, 267 Wis. 2d 92, 110–11, 673 N.W.2d 676, 685.

Again, the parties stipulated to the fact that Ellis performed work for Pron-Tow on May 16 and 17, 2019, but Pron-Tow did not pay her for the work performed. (Stip. Facts ¶ 39.) At trial, Judge Stadtmueller found that Ellis was entitled to the approximately $200 in pay for her last two days of work, stating that "it's not Ms. Ellis' fault that she didn't get paid." (Tr. 143.) However, he also states that the reason Ellis did not get paid was because she "didn't comply with what Mr. Zingg reasonably asked of her, and that is an exit interview and the return of the property." (Tr. 145.) This statement tends to indicate that he does find Ellis at fault for her failure to be paid.

The record, however, is disputed as to whether Ellis failed to return property to Pron-Tow. On the one hand, Zingg testifies that Ellis failed to return the property. Contrarily, Ellis testifies that she did. And as for the exit interview, the parties do not cite and I have not found any legal authority allowing an employer to withhold a final paycheck for failure to attend an exit interview. In fact, under Wisconsin law, "[a]ny employee . . . not having a

12

written contract for a definite period, who quits employment . . . shall be paid in full by no later than the date on which the employee regularly would have been paid under the employer's established payroll schedule or the date of payment required under sub. (1), whichever is earlier." Wis. Stat. § 109.03(2).

Because it does not appear from the record that defendants' failure to pay Ellis for her last two days of work was the result of an honest mistake or reasonable dispute, I recommend she be awarded liquidated damages in the amount of $96.75.

### 3.5    Offset for Failure to Return Property

Defendants' sole defense as to Ellis' claim of damages is the allegation that she has in her possession a Panasonic Toughbook 33-12" Core, 108104-VPRO GM RAM – 512 GBS, and its accessories, belonging to Pron-Tow. (Affidavit of Jeffrey Zingg ("Zingg Aff.") ¶ 6, Docket # 44.) Zingg avers that the computer is worth $6,928.23 (*id.* ¶ 7) and that he never pursued return of the computer after Ellis left Pron-Tow, "essentially considering it an offset to any money owed to her from her employment with Pron Tow Towing" (*id.* ¶ 9).

Ellis contends, and defendants do not dispute, that defendants did not raise the issue of the alleged failure to return property in its answer, or at any point in the litigation prior to trial. (Pl.'s Br. at 14.) This is highly problematic. In cases under the FLSA, the issue of setoff is generally raised as an affirmative defense. *See, e.g.*, *DeKeyser v. Thyssenkrupp Waupaca, Inc.*, 747 F. Supp. 2d 1043, 1056 (E.D. Wis. 2010*); Pietrzycki v. Heights Tower Serv., Inc.*, No. 14 C 6546, 2015 WL 688510, at *4 (N.D. Ill. Feb. 17, 2015). Under Fed. R. Civ. P. 8(c), a party "must affirmatively state any avoidance or affirmative defense" in its responsive pleading. However, a delay in asserting an affirmative defense only waives the defense if the plaintiff

13

was harmed as a result. *Russian Media Grp., LLC v. Cable Am., Inc.*, 598 F.3d 302, 309 (7th Cir. 2010).

In this case, I find that Ellis was harmed by defendants' failure to raise the issue at the outset of litigation. In October 2022, Zingg avers that Pron-Tow never pursued return of the computer after Ellis failed to contact him for an exit interview because they considered the computer an offset to any money owed to her. (Zingg Aff. ¶ 9.) This statement seems to indicate that defendants were aware of this issue as early as May 2019, when Ellis quit her employment with Pron-Tow. However, even when raising the issue for the first time at trial, defendants failed to submit any detail as to just exactly what property Ellis allegedly failed to return and its value, which is suspect when Pron-Tow allegedly considered the property a wage offset since her departure. Again, the exact amount of the alleged setoff and a description of the property came in Zingg's October 2022 affidavit.

And, of course, the testimony presented at trial regarding the unreturned property conflicts. Again, Ellis testified that she returned keys to the building, either one or two monitors, and a "mini computer" after she quit, which was "all the company equipment" that she had in her possession. (Tr. 91.) Zingg, on the other hand, testified that none of the property "described by Miss Ellis" was ever returned to Pron-Tow, to his knowledge. (Tr. 117.) Even this is suspect. So were the monitors and keys also part of the setoff? Is that one of the "accessories" mentioned in the affidavit? Zingg further testified that defendants never inquired about return of the property when Ellis left. (Tr. 117.) Thus, Ellis presumably only became aware of defendants' offset plan during trial in July 2022.

At trial, Judge Stadtmueller did leave open the possibility of offsetting wages owed for unreturned property (Tr. 143, 145), but he noted that it was "unfortunate that we got all

14

the way to July 18, 2022, from January of 2020 to realize that this is a disputed matter" (Tr. 145). It is untenable that the defendants were unaware of this issue until July 2022, and Zingg's post-trial affidavit confirms that. Thus, it is highly prejudicial to Ellis for this issue to be raised for the first time at trial. As such, I recommend any setoff be denied for this reason alone.

Even assuming, however, that defendants timely raised the issue and Ellis never returned the computer, this is not a proper offset under either Wisconsin law or the FLSA. Under Wis. Stat. § 103.455:

> No employer may make any deduction from the wages due or earned by any employee, who is not an independent contractor, for defective or faulty workmanship, lost or stolen property or damage to property, unless the employee authorizes the employer in writing to make that deduction or unless the employer and a representative designated by the employee determine that the defective or faulty workmanship, loss, theft or damage is due to the employee's negligence, carelessness, or willful and intentional conduct, or unless the employee is found guilty or held liable in a court of competent jurisdiction by reason of that negligence, carelessness, or willful and intentional conduct.

Given there is no evidence that Ellis agreed, in writing (or even knew about, for that matter), Zingg's alleged statement that he intended the computer to be an offset to any money owed, the computer cannot legally be used as an offset for Ellis' unpaid wages under Wisconsin law.

As to Ellis' unpaid overtime wages under the FLSA, because defendants did not properly plead setoff as an affirmative defense, I must assume that they raise the issue pursuant to § 207(h) of the FLSA, which allows employers to "credit 'extra compensation' paid pursuant to Section 207(e)(5)-(7) towards overtime compensation due to employees." *Caraballo v. City of Chicago*, 969 F. Supp. 2d 1008, 1023 (N.D. Ill. 2013). But all three

15

subsections address "extra compensation provided by a premium rate." There is no support for the assertion that the computer falls under this section of the statute.

Rather, what defendants truly wish to do is setoff the unpaid overtime by Ellis' alleged "theft" of the computer. But there is no support for this in the FLSA, a statute whose purpose is to ensure employer compliance with wage laws, not to adjudicate damages for an employee's alleged tortious or intentional conduct. *See Martin v. PepsiAmericas, Inc.*, 628 F.3d 738, 740 (5th Cir. 2010). The court's decision in *Reyes v. ML Enterprises*, No. 21-C-0437, 2021 WL 2226108 (E.D. Wis. June 2, 2021) is instructive. In *Reyes*, plaintiff sued his former employer under the FLSA and Wisconsin law for, amongst other things, failure to pay overtime wages and making improper wage deductions under Wis. Stat. § 103.455. The defendant employer counterclaimed for damage allegedly caused to a truck by plaintiff's negligence and for theft for failing to return some tools when he left his employment. *Id.* at *1–2. The plaintiff moved to dismiss the counterclaims, arguing that damage to the truck and theft of the tools were not within the court's supplemental jurisdiction. In finding these claims were not part of the court's supplemental jurisdiction, the court reasoned that "the plaintiff's liability for negligence and theft will not in any way turn on the facts relevant to whether the defendants paid the plaintiff the wages to which he was entitled under the FLSA." *Id.* at *2.

For these reasons, I find there is no legal support under the FLSA for defendants to offset Ellis' overtime pay by the price of the allegedly unreturned computer. As such, I recommend that Ellis' damages award not be offset by the cost of the alleged unreturned computer.

*Attorneys' Fees*

Ellis further seeks attorneys' fees and costs in the amount of $71,011.13, specifically attorneys' fees in the amount of $67,920.00 and costs in the amount of $3,091.13. Defendants argue that because of the setoff, Ellis suffered no loss under the FLSA and thus is not entitled to attorneys' fees. (Defs.' Br. at 4.) Alternatively, defendants argue that awarding attorneys' fees to plaintiff's counsel would produce an absurd result because counsel would be enriched for merely exposing Ellis to claims (presumably for theft) that are beyond what defendants may owe her for overtime pay. (*Id.*) Defendants do not otherwise challenge the plaintiffs' stated hourly rate or the number of hours expended, nor do they develop any arguments as to why the lodestar amount should be adjusted.

   *1.    Legal Standard*

Under the FLSA, the "prevailing party" is entitled to "a reasonable attorney's fee to be paid by the defendant, and costs of the action." 29 U.S.C. § 216(b); *Johnson v. GDF, Inc.*, 668 F.3d 927, 930 (7th Cir. 2012). The general rule for calculating attorneys' fee awards under fee shifting statutes is applicable to attorneys' fees awards under the FLSA. *See Johnson*, 668 F.3d at 931; *Spegon v. Cath. Bishop of Chicago*, 175 F.3d 544, 550 (7th Cir. 1999). The starting point for determining reasonable attorneys' fees is the lodestar method, which is calculated by multiplying the number of hours reasonably expended by the reasonable hourly rate. *Pickett v. Sheridan Health Care Center*, 664 F.3d 632, 639 (7th Cir. 2011) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). There is a "strong presumption that the lodestar represents the reasonable fee." *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992) (internal quotation marks omitted); *Pickett*, 664 F.3d at 639. However, once the lodestar is determined, the court may adjust the fee upward or downward based on a variety of factors,

17

the most important of which is the degree of success obtained. *Hensley*, 461 U.S. at 430, n.3, 436. The other factors to be considered as delineated by the Supreme Court are:

> (1) the time and labor required; (2) the novelty and difficulty of the question; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to the acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) any time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the plaintiff's attorney; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Tolentino v. Friedman*, 46 F.3d 645, 652 (7th Cir. 1995) (citing *Hensley*, 461 U.S. at 441). In sum, "[t]he standard is whether the fees are reasonable in relation to the difficulty, stakes, and outcome of the case." *Connolly v. Nat'l Sch. Bus Serv., Inc.*, 177 F.3d 593, 597 (7th Cir. 1999). The fee applicant bears the burden of "produc[ing] satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community." *Id.* (quoting *Blum v. Stenson*, 465 U.S. 886, 895 n. 11 (1984)). If the fee applicant satisfies this burden, the burden shifts to the other party to offer evidence that sets forth "a good reason why a lower rate is essential." *Id.* (internal quotation and citations omitted).

2.   *Calculation of the Lodestar*

Ellis seeks fees for the work of three attorneys. Specifically, Ellis seeks the following:

| Attorney | Hours | Hourly Rate | Attorneys' Fees |
|---|---|---|---|
| James Walcheske | 137.1 | $450 | $61,695.00 |
| Scott Luzi | 6.9 | $450 | $3,105.00 |
| Matthew Tobin | 9.6 | $325 | $3,120.00 |
| **TOTAL** | | | **$67,920.00** |

18

### 2.1 Hourly Rate

While defendants do not challenge the attorneys' stated hourly rates, Ellis remains obligated to prove an attorney's "reasonable hourly rate," which is based on the "market rate" for the services rendered. *Spegon*, 175 F.3d at 554. Once, however, the attorney provides evidence establishing his market rate, the burden shifts to the defendant to demonstrate why a lower rate should be awarded. *Id.* at 554–55.

An attorney's "market rate is the rate that lawyers of similar ability and experience in the community normally charge their paying clients for the type of work in question." *Id.* at 555 (internal quotation and citation omitted). Furthermore, the "attorney's actual billing rate for comparable work is 'presumptively appropriate' to use as the market rate." *Id.* If the district court is unable to determine the attorney's actual billing rate because, for example, the attorney has no fee-paying clients, then the district court should look to the next best evidence. *Id.* The next best evidence of an attorney's market rate includes evidence of rates similarly experienced attorneys in the community charge paying clients for similar work and evidence of fee awards the attorney has received in similar cases. *Id.*

I recently recommended to this Court that the reasonable hourly rate of Attorney Robert M. Mihelich, an attorney who has practiced law in Wisconsin for over twenty-nine years and has dedicated the last approximately twenty-six years to employment-related claims, was $350/hour in 2019 and $400/hour in 2020 through 2022. (*See Jimenez et al v. Illini Precast LLC et al*, 19-CV-1623-JPS, Report and Recommendation dated 9/28/2022, Docket # 73.) Attorneys Walcheske and Luzi, who charged $400/hour until March 31, 2022 and $450/hour beginning April 1, 2022 (Declaration of James A. Walcheske ¶¶ 11–12, Docket # 40), have significantly less experience than Attorney Mihelich, at fourteen years

19

and twelve years, respectively (Walcheske Decl. ¶ 3; Declaration of Scott Luzi ¶ 2, Docket # 66). In *Jimenez*, I noted that Attorney Larry A. Johnson currently continues to bill at a rate of $400/hour for multi-plaintiff wage and hour cases litigated under the FLSA, an attorney with more experience (i.e., sixteen years) than both Attorneys Walcheske and Luzi. (Docket # 73 at 6–8 in Case No. 19-CV-1623.)

For the same reasons I recommended an hourly rate of $400/hour in *Jimenez*, I similarly recommend an hourly rate of no more than $400/hour for Attorneys Walcheske and Luzi.

### 2.2    Number of Hours Expended

Three attorneys spent approximately 154 hours litigating this case for approximately two years and nine months, including taking the matter through trial. There is nothing that strikes me as excessive about this number, especially when compared to another recent FLSA case where two attorneys spent almost 442 hours litigating the case over a three-year period. (*See* Docket # 73 at 8–17 in Case No. 19-CV-1623.) Thus, I do not recommend a reduction in the number of hours expended.

### 2.3    Lodestar Amount

Again, the lodestar amount is calculated by multiplying the number of hours reasonably expended by the reasonable hourly rate. *Pickett*, 664 F.3d at 639.

| Attorney | Hours | Hourly Rate | Attorneys' Fees |
|---|---|---|---|
| James Walcheske | 137.1 | $400 | $54,840.00 |
| Scott Luzi | 6.9 | $400 | $2,760.00 |
| Matthew Tobin | 9.6 | $325 | $3,120.00 |
| **TOTAL** | | | **$60,720.00** |

20

### 2.4 Adjustment of Lodestar

Although there is a strong presumption that the lodestar represents the reasonable fee, *Pickett*, 664 F.3d at 639, the court may adjust the fee upward or downward based on a variety of factors, the most important of which is the degree of success obtained, *Hensley*, 461 U.S. at 430, n.3, 436. Although undeveloped, defendants seem to argue that Ellis failed to properly prosecute this action, resulting in overlitigation and increased fees. (Defs.' Br. at 2–3.) Defendants further argue that awarding Ellis' counsel fees would enrich the attorneys while exposing the client to claims from Pron-Tow for an amount beyond what they owe. (*Id.* at 4.)

But the fact that Ellis may later be sued by Pron-Tow for conversion or some other claim does not factor into the calculation of the lodestar in the FLSA case. And while Judge Stadtmueller was indeed quite critical of how the parties litigated this case (Tr. 144–46), it does not appear that he assigned more fault to Ellis than to the defendants. Thus, I see no reason to adjust the lodestar either up or down.

For these reasons, I recommend Ellis be awarded $63,811.13 in attorneys' fees and costs.

**NOW, THEREFORE, IT IS RECOMMENDED THAT** Ellis be awarded $2,354.72 in overtime pay and $2,354.72 in liquidated damages under the FLSA; $193.50 in unpaid wages and $96.75 in liquidate damages under the WWPCL; and $63,811.13 in attorneys' fees and costs under the FLSA.

Your attention is directed to General L.R. 72(c), 28 U.S.C. § 636(b)(1)(B) and Federal Rules of Criminal Procedure 59(b), or Federal Rules of Civil Procedure 72(b) if applicable, whereby written objections to any recommendation or order herein, or part

thereof, may be filed within fourteen days of the date of service of this recommendation or order. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Failure to file a timely objection with the district court shall result in a waiver of a party's right to appeal. If no response or reply will be filed, please notify the Court in writing.

Dated at Milwaukee, Wisconsin this 7th day of February, 2023.

BY THE COURT:

NANCY JOSEPH
United States Magistrate Judge